XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
JAY C. RUSSELL, State Bar No. 122626
CHAD A. STEGEMAN, State Bar No. 225745
PETER H. CHANG, STATE BAR NO. 241467
Deputy Attorneys General
    455 Golden Gate Ave., Ste. 11000
    San Francisco, CA  94102-7004
    Telephone:  (415) 510-3776
    Fax:  (415) 703-1234
    E-mail:  Peter.Chang@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| JERRY GRIFFIN, et. al,<br><br>                              Plaintiffs,<br><br>          v.<br><br>ALEX PADILLA,<br><br>                              Defendant. | No. 2:19-cv-01477-MCE-DB<br>No. 2:19-cv-01501-MCE-DB<br>No. 2:19-cv-01506-MCE-DB<br>No. 2:19-cv-01507-MCE-DB<br>No. 2:19-cv-01659-MCE-DB<br><br>**STATE DEFENDANTS' OMNIBUS OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION** |
| AND RELATED CASES. | Hearing Date: Sept. 19, 2019<br>Hearing Time: 2:00 p.m.<br>Location: Courtroom 7<br>Judge: Hon. Morrison C. England, Jr. |

1

# TABLE OF CONTENTS

2
**Page**

Introduction ................................................................................................................. 1

Background ................................................................................................................. 3

    I.      The Presidential Tax Transparency and Accountability Act ................................ 3

    II.     The Plaintiffs and Claims Relevant to Their Motions ........................................... 5

Argument .................................................................................................................... 6

    I.      Plaintiffs Are Not Likely to Succeed on the Merits. ........................................... 7

        A.    The Act Does Not Create an Additional Qualification In Violation of the Presidential Qualifications Clause. .................................................. 7

        B.    The Act Does Not Exceed California's Authority to Regulate Elections. ................................................................................................... 10

        C.    The Act Does Not Violate Plaintiffs' First Amendment Associational, Ballot-Access, or Voting Rights. .................................... 12

            1.    The Burdick balancing test. ....................................................... 13

            2.    The Act imposes only a slight burden on plaintiffs' asserted rights. ................................................................................ 14

            3.    The act furthers the State's compelling interests, which outweigh the slight burden on plaintiffs' asserted rights............. 19

        D.    The Act Does Not Violate Plaintiff De La Fuente's First Amendment Right Against Compelled Speech. ...................................... 22

        E.    The Act Does Not Violate the Equal Protection Clause. ........................ 24

            1.    The Act does not unconstitutionally discriminate against partisan candidates in favor of independent candidates. .............. 24

            2.    The Act does not otherwise violate the Equal Protection Clause. ........................................................................................ 26

        F.    The Act Is Not Preempted by EIGA. ..................................................... 26

        G.    The Act Does Not Violate, and Is Not Preempted by, the Internal Revenue Code. ..................................................................................... 28

    II.     In the Absence of any Constitutional Violation, Plaintiffs Cannot Show Irreparable Harm ................................................................................................ 30

    III.    Plaintiffs Cannot Meet Their Burden to Show that the Balance of Equities and the Public Interest Tip in Their Favor ...................................................... 30

Conclusion................................................................................................................ 31

i

1

# TABLE OF AUTHORITIES

2

**Page**

3  CASES

4  *Abbott v. Perez*
5       138 S.Ct. 2305 (2018) ................................................................................................ 30

6  *Altria Grp., Inc. v. Good*
         555 U.S. 70 (2008) ..................................................................................................... 26

7  *Am. Beverage Ass'n v. City & Cty. of San Francisco*
8       916 F.3d 749 (9th Cir. 2019) ....................................................................................... 6

9  *Anderson v. Celebrezze*
10      460 U.S. 780 (1983) ............................................................................................ *passim*

11  *Ariz. Libertarian Party v. Reagan*
         798 F.3d 723 (9th Cir. 2015) ................................................................................14, 16

12  *Ariz. v. Inter Tribal Council of Ariz., Inc.*
13       570 U.S. 1 (2013) ....................................................................................................... 11

14  *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*
15       622 F. Supp. 2d 935 (N.D. Cal. 2009) ...................................................................... 27

16  *Barry v. City of New York*
         712 F.2d 1554 (2d Cir. 1983) ...............................................................................17, 20

17  *Bates v. Dow Agrosciences LLC*
18       544 U.S. 431 (2005) ................................................................................................... 26

19  *Biener v. Calio*
         361 F.3d 206 (3d Cir. 2004) ................................................................................... 8, 10
20

21  *Buckley v. Valeo*
         424 U.S. 1 (1976) (*per curiam*) ............................................................................... 20

22  *Bullock v. Carter*
23       405 U.S. 134 (1972) ...............................................................................................14, 15

24  *Burdick v. Takushi*
         504 U.S. 428 (1992) ...............................................................................................13, 14
25

26  *Campbell v. Davidson*
         233 F.3d 1229 (10th Cir. 2000) .................................................................................. 8

27  *Cartwright v. Barnes*
28       304 F.3d 1138 (11th Cir. 2002) ................................................................................... 9

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3

*Chamness v. Bowen*
4
        722 F.3d 1110 (9th Cir. 2013) ........................................................................ 14

5
*Clements v. Fashing*
        457 U.S. 957 (1982) ....................................................................................... 14
6

7
*Communist Party of Indiana v. Whitcomb*
        414 U.S. 441 (1974) ...................................................................................10, 15

8
*Cook v. Gralike*
        531 U.S. 510 (2001) ....................................................................................12, 19
9

10
*De la Fuente v. Merrill*
        214 F. Supp. 3d 1241 (M.D. Ala. Oct. 7, 2016) ............................................... 9

11
*De La Fuente v. Padilla*
12
        930 F.3d 1101 (9th Cir. 2019) .................................................................14, 16, 21

13
*Democratic Party of U.S. v. Wis.*
        450 U.S. 107 (1981) ....................................................................................... 25
14

15
*Dudum v. Arntz*
        640 F.3d 1098 (9th Cir. 2011) ........................................................................ 14
16

17
*Duplantier v. United States*
        606 F.2d 654 (5th Cir. 1979) .......................................................................... 17

18
*El-Amin v. State Bd. of Elec.*
        717 F. Supp. 1138 (E.D. Va. 1989) ................................................................. 18
19

20
*Fed. Election Comm'n v. Furgatch*
        807 F.2d 857 (9th Cir. 1987) .......................................................................... 20

21
*Fritz v. Gorton*
22
        517 P.2d 911 (Wash. 1974) ............................................................................ 15

23
*Garcia v. Google, Inc.*
        786 F.3d 733 (9th Cir. 2015) ............................................................................ 7
24

25
*Hein v. Freedom From Religion Found., Inc.*
        551 U.S. 587 (2007) ......................................................................................... 5

26
*Human Life of Wash. Inc. v. Brumsickle*
27
        624 F.3d 990 (9th Cir. 2010) ......................................................................20-21

28

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Illinois State Employees Ass'n v. Walker*
   315 N.E.2d 9 (Ill. 1974) ........................................................................ 15

*Indep. Living Ctr., So. Cal. v. Maxwell-Jolly*
   572 F.3d 644 (9th 2009)......................................................................... 30

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
   97 F. Supp. 2d 1256 (W.D. Wash. 2015) .............................................. 27

*Interpipe Contracting, Inc. v. Becerra*
   898 F.3d 879 (9th Cir. 2018)................................................................. 24

*Libertarian Party of Illinois v. Rednour*
   108 F.3d 768 (7th Cir. 1997) ................................................................. 9

*Lomont v. Summers*
   135 F. Supp. 2d 23 (D.D.C. 2001)........................................................ 29

*Lubin v. Panish*
   414 U.S. 709 (1974)............................................................................... 15

*Matsumoto v. Pua*
   775 F.2d 1393 (9th Cir. 1985) .............................................................. 19

*McClellan v. I-Flow Corp.*
   776 F.3d 1035 (9th Cir. 2015)............................................................... 29

*Merle v. United States*
   351 F.3d 92 (3d Cir. 2003)...................................................................... 9

*Montgomery Co. v. Walsh*
   336 A.2d 97 (Md. 1975)......................................................................... 15

*Munro v. Socialist Workers Party*
   479 U.S. 189 (1986)............................................................................... 13

*Murphy v. Nat'l Collegiate Athletic Ass'n*
   138 S. Ct. 1461 (2018).......................................................................... 28

*O'Brien v. DiGrazia*
   544 F.2d 543 (1st Cir. 1976) ................................................................. 17

*Orin v. Barclay*
   272 F.3d 1207 (9th Cir. 2001)............................................................... 26

iv

1

### TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Plante v. Gonzalez*

4
575 F.2d 1119 (5th Cir. 1978) .................................................................15, 17, 20

*Printz v. United States*

5
521 U.S. 898 (1997)....................................................................................... 28

6

*Public Integrity Alliance, Inc. v. City of Tucson*

7
836 F.3d 1019 (9th Cir. 2016) (en banc)....................................................12, 13, 22

8

*Riley v. National Federation of the Blind of North Carolina, Inc.*
487 U.S. 781 (1988)....................................................................................... 23

9

*Rucho v. Common Cause*

10
139 S. Ct. 2484 (2019) ................................................................................... 11

11

*Rumsfeld v. Forum for Academic & Institutional Rights (FAIR), Inc.*

12
547 U.S. 47 (2006)......................................................................................... 22

13

*Schaefer v. Townsend*
215 F.3d 1031 (9th Cir. 2000) ......................................................................8, 9, 10

14

*Schaumburg v. Citizens for a Better Environment*

15
444 U.S. 620 (1980)....................................................................................... 23

16

*Stein v. Howlett*

17
289 N.E.2d 409 (Ill. 1972) ............................................................................. 15

18

*Storer v. Brown*
415 U.S. 724 (1974)....................................................................................... 25

19

*U.S. Term Limits, Inc. v. Thornton*

20
514 U.S. 779 (1995)................................................................................... 8, 11

21

*United States v. Sheriff, City of N.Y.*

22
330 F.2d 100 (2d Cir. 1964) ........................................................................... 29

23

*Univ. of Texas v. Camenisch*
451 U.S. 390 (1981)......................................................................................... 6

24

*Van Susteren v. Jones*

25
331 F.3d 1024 (9th Cir. 2003) .....................................................................8, 25

26

*West Virginia Board of Education v. Barnette*
319 U.S. 624 (1943)....................................................................................... 24

27

28

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Williamson v. Lee Optical of Ok. Inc.*
    348 U.S. 483 (1955).......................................................................................... 21

4

5

*Winter v. Nat'l Res. Def. Council, Inc.*
    555 U.S. 7 (2008).......................................................................................... 6, 30

6

7

*Wooley v. Maynard*
    430 U.S. 705 (1977).......................................................................................... 24

8

*Wyeth v. Levine*
    555 U.S. 555 (2009).......................................................................................... 26

9

10

**STATUTES**

11

5 U.S.C. Appendix
    4 .............................................................................................................................. 4

12

    4 § 101(a)(3) ........................................................................................................ 18
    4 § 101(c).................................................................................................... 18, 21, 27

13

    4 § 102(b) ............................................................................................................ 18
    4 § 107(b) .................................................................................................... 26, 27

14

15

26 U.S.C. § 6103 .................................................................................................... *passim*

16

California Elections Code
    § 6000.1............................................................................................................ 15, 16

17

    § 6000.2 ................................................................................................................ 16
    § 6002 .................................................................................................................... 22

18

    § 6881.................................................................................................... 4, 13, 30

19

    § 6883.................................................................................................... 10, 16
    § 6884.................................................................................................... 4, 16, 29

20

    § 8900.................................................................................................................... 4

21

California's Presidential Tax Transparency and Accountability Act.................................... *passim*

22

Ethics in Government Act of 1978 .................................................................................... *passim*

23

**CONSTITUTIONAL PROVISIONS**

24

U.S. Constitution Article 2, § 1, cl. 5 ................................................................................ 8

25

**OTHER AUTHORITIES**

26

California Secretary of State, Qualified Political Parties,
    https://www.sos.ca.gov/elections/political-parties/qualified-political-parties/

27

    (last visited Sept. 5, 2019)...................................................................................... 4

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*President Nixon's Troublesome Tax Returns*, The Tax History Project (May. 1, 1974), https://bit.ly/1XazOkc (last visited Sept. 5, 2019) ........................................................ 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1

## INTRODUCTION

2          California's Presidential Tax Transparency and Accountability Act ("the Act") is a

3    constitutionally valid ballot-access measure that requires presidential and gubernatorial

4    candidates to redact and submit their last five tax returns to the Secretary of State for public

5    release if they wish to appear on the primary election ballot.  The California Legislature passed

6    the Act to codify a custom followed by presidential candidates for the past five decades.  The

7    Legislature found that candidates' income tax returns contain essential information regarding

8    their financial interests and business dealings, and illuminate potential conflicts of interest and

9    other improprieties.  It determined the Act will help California primary voters make better

10   informed decisions when choosing presidential and gubernatorial candidates in primary elections,

11   and promote the California's compelling interest in ensuring an informed electorate.  Without the

12   Act, California primary voters would not have access to information about the financial interests

13   of presidential candidate running in California's primaries, since financial disclosures under the

14   federal Ethics in Government Act (EIGA) are not available until after California's primary.

15         Five sets of plaintiffs challenge the Act, including two presidential candidates, three

16   political organizations, and eight individual voters.  They seek a preliminary injunction based on

17   claims, made either collectively or separately, that the Act violates the United States

18   Constitution's Presidential Qualifications Clause, by imposing an additional "qualification" on

19   the Office of the President, and that it violates the First Amendment, by infringing on the

20   candidates' ballot-access rights and rights against compelled speech, the political organizations'

21   associational rights, and the voters' associational and voting rights.  They further claim the Act

22   violates the Equal Protection Clause and is preempted by EIGA and 26 U.S.C. § 6103(a), which

23   prohibits government officials from disclosing an individual's tax returns without consent.

24         The motions should be denied because plaintiffs' claims are not likely to succeed on the

25   merits, and the balance of harms tips heavily in favor of the State Defendants.  The Act does not

26   create an absolute bar on ballot access or impose a handicap on a constitutionally significant class

27   of candidates based on any additional "qualification" inherent in the candidate—*all* candidates

28

1

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1    are capable of complying with the Act.  Moreover, the Act is a generally applicable, even-handed

2    ballot-access measure, and any slight burden imposed on the plaintiffs' asserted First Amendment

3    rights is outweighed by the State's compelling interest in ensuring an informed electorate.

4    Significantly, neither presidential-candidate plaintiff has identified any practical burden imposed

5    on them by the Act.  They simply do not want to comply.  And the non-candidate plaintiffs'

6    purported harm is derived from the candidate's choice not to comply, not from the Act itself.  The

7    Act also does not compel speech by forcing candidates to associate with messages or opinions

8    with which they disagree; candidates only need disclose truthful, factual information already

9    provided by the candidates themselves to taxing authorities.

10          The equal-protection challenge to the Act is also insubstantial.  Contrary to plaintiffs'

11   theory, partisan and independent candidates are not "similarly situated" with respect to the routes

12   they must take to get to the general election ballot.  The Act applies only at the primary stage,

13   where independent candidates do not compete.  There is no unlawful discrimination.

14          And finally, the Act is not preempted by either EIGA or the Internal Revenue Code, 26

15   U.S.C. § 6103(a).  Plaintiffs fail to show that Congress intended EIGA to preempt states from

16   requiring candidates to make tax disclosures in state-run primary elections.  The supposed express

17   "preemption clause" they cite makes no specific reference to tax returns, state law, or preemption.

18   And EIGA's legislative history confirms that Congress did not intend to preempt state law.  The

19   Act also is not preempted by, and does not violate, the Internal Revenue Code, 26 U.S.C.

20   § 6103(a), because nothing in federal law prevents candidates from providing consent to state

21   officials to release their tax returns to the public.

22          Because plaintiffs fail to show any constitutional violation or preemption, they also fail to

23   show that the Act causes them irreparable harm.  And the non-candidate plaintiffs' harm is fully

24   derived from presidential candidates' choices, not from the Act.  The only harm here would result

25   from an injunction barring enforcement of a duly enacted state law, and the harm would be

26   inflicted on California voters, who would be deprived of critical information about the candidates

27   appearing on the primary ballot.

28          Finally, the Court should not enjoin enforcement of the Act because it would be against

2

1     the public interest to permit presidential primary candidates to withhold vital information from

2     voters about the candidates' financial interests and business dealings.  In light of the critically

3     important public interest in disclosure, and plaintiffs' failure, including candidate-plaintiffs De La

4     Fuente and President Trump, to allege any concrete, practical injury stemming from compliance

5     with the Act, the balance of equities tips sharply in favor of the State Defendants.

6         Accordingly, plaintiffs' motions should be denied.

7                    **BACKGROUND**

8     **I.     THE PRESIDENTIAL TAX TRANSPARENCY AND ACCOUNTABILITY ACT**

9         In 1973, newspapers published information showing that President Richard Nixon had

10     paid an inexplicably low amount of federal tax in 1969, given his income for that year.  When

11     called upon to release his tax returns, President Nixon responded: "I welcome this kind of

12     examination because people have got to know whether or not their president is a crook.  Well, I

13     am not a crook."[1]  Nixon eventually released his tax returns and underwent an Internal Revenue

14     Service audit.  The IRS ultimately determined that President Nixon had improperly deducted

15     more than $500,000 for papers donated to the National Archives, and he paid nearly half of his

16     net worth in back taxes.[2]

17         In the forty-six years since then, most presidential candidates have voluntarily released

18     their federal tax returns as a matter of routine.  Voters—including voters in California primary

19     elections—have had the benefit of this information when evaluating presidential candidates.  But

20     during his 2016 presidential campaign, Donald Trump broke with this longstanding tradition and

21     refused to release his tax returns.  Sen. Floor Analysis to Senate Bill No. 27 (2019-2020 Reg.

22     Sess.) July 10, 2019, at 5.  Prompted by this break in customary practice, the California

23     Legislature enacted Senate Bill 27, the Presidential Tax Transparency and Accountability Act.

24     *Id.*

25         In enacting the bill, the Legislature found that California "has a strong interest in ensuring

26     that its voters make informed, educated choices in the voting booth," and that "a Presidential

---

[1] Alan Axelrod, Profiles on Folly 104 (Sterling Publishing 2008).
[2] William D. Samson, *President Nixon's Troublesome Tax Returns*, The Tax History Project (May. 1, 1974), https://bit.ly/1XazOkc (last visited Sept. 5, 2019).

candidate's income tax returns provide voters with essential information regarding the candidate's potential conflicts of interest, business dealings, financial status, and charitable contributions." Cal. Elec. Code § 6881.  California "has a special interest in the President refraining from corrupt or self-enriching behaviors while in office," and the people of California "can better estimate the risks of any given Presidential candidate engaging in corruption or the appearance of corruption if they have access to the candidates' tax returns."  *Id.*  "The information in tax returns therefore helps voters to make a more informed decision."  *Id.*  While the information in a candidate's tax return is partially covered in the candidate's Federal Election Commission filing mandated by EIGA, 5 U.S.C. App. 4, "the information contained in a tax return is broader and more specific." Sen. Floor Analysis to Senate Bill No. 27 (2019-2020 Reg. Sess.) Apr. 24, 2019, at 4.

Accordingly, consistent with the goal that California voters be an "informed electorate," the Act requires presidential primary candidates to file with the Secretary of State two copies of their income tax returns from the five most recent taxable years, one of which has the candidate's personal information redacted, as well as consent for the Secretary of State to publicly release the redacted copy on the Secretary's website.  *See* Cal. Elec. Code § 6884(a).[3]  After the official canvass for the presidential primary election is completed, the public versions of the tax returns must be removed from the website.  *Id.* § 6884(b)(3).  After the official canvass of the ensuing general election, the Secretary of State must destroy the paper copies of the submitted returns.  *Id.* § 6884(b)(4).

While not challenged in this case, the Act also applies to all candidates for California governor participating in primary elections.  *See* Cal. Elec. Code § 8900.

There are six political parties that are qualified to participate in California's upcoming primary elections: the American Independent Party, the Democratic Party, the Green Party, the Libertarian Party, the Peace and Freedom Party, and the Republican Party.  *See* California Secretary of State, Qualified Political Parties, https://www.sos.ca.gov/elections/political-

---

[3] The Act requires candidates to redact social security numbers, home addresses, telephone numbers, email addresses, medical information (Cal. Elec. Code § 6884(a)(1)(B)), and permits candidates to redact the names of dependent minors, employer identification numbers, business addresses, and paid tax return preparers' tax identification numbers, addresses, telephone numbers, and email addresses.  *Id.* § 6884(a)(1)(C).

4

1   parties/qualified-political-parties/ (last visited Sept. 5, 2019).

2   **II.   THE PLAINTIFFS AND CLAIMS RELEVANT TO THEIR MOTIONS**

3         The five related cases were brought by two presidential candidates (Roque "Rocky" De La

4   Fuente and current President Donald J. Trump), a reelection-campaign principal committee

5   (Donald J. Trump for President, Inc.), national and state political parties (the Republican National

6   Committee and the California Republican Party), and eight registered voters (Griffin, Bolotin,

7   Sienkiewicz, Oerding, Koenig, Melendez, Essayli, and McDougald).

8         Plaintiffs Griffin, Bolotin, Sienkiewicz, and Oerding (collectively, the *Griffin* Plaintiffs) are

9   individual voters who assert as bases for their motion that the Act violates (1) the Qualifications

10  Clause (*Griffin* Mem. in Supp. Mot. Preliminary Inj. (*Griffin* Mot.), No. 2:19-cv-01477 ECF No.

11  20-1 at 3-6), (2) their First Amendment rights to associate with the presidential candidate of their

12  choice (*id.* at 7), and (3) the Equal Protection Clause (*id.* at 11-12).[4]

13        Plaintiffs Donald J. Trump for President, Inc. and Donald J. Trump, in his personal capacity

14  (collectively, the *Trump* Plaintiffs), are the incumbent President, Donald J. Trump, and his re-

15  election campaign committee.  They assert as bases for their motion that the Act (1) violates the

16  Qualifications Clause (*Trump* Mem. in Supp. Mot. for Preliminary Inj. (*Trump* Mot.), No. 2:19-

17  cv-01501 ECF No. 10-1 at 6), (2) violates President Trump's First Amendment right to access the

18  Republican primary election ballot (*id.* at 11), (3) exceeds the states' authority to regulate

19  elections (*id.* at 8), and (4) is preempted by EIGA (*id.* at 13).

20        Plaintiffs Melendez, Essayli, McDougald, the Republican National Committee, and the

21  California Republican Party (collective, the *Melendez* Plaintiffs) assert as bases for their motion

22  that the Act violates (1) the Qualifications Clause (*Melendez* Mem. in Supp. of Mot. Preliminary

23  Inj. (*Melendez* Mot.), No. 2:19-cv-01506 ECF No. 17, at 8-10), (2) their voter plaintiffs' First

24        [4] Plaintiffs Bolotin and Oerding lack standing to challenge the Act because they do not
25  claim to support any presidential candidates who would be listed on the primary election ballot
    except for the Act.  *See* Declaration of Michelle Bolotin, 2:19-cv-01477 ECF No. 20-4;
26  Declaration of James B. Oerding, 2:19-cv-01477 ECF No. 20-6.  To establish Article III standing,
    "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful
27  conduct and likely to be redressed by the requested relief."  *Hein v. Freedom From Religion
    Found., Inc.*, 551 U.S. 587, 597-98 (2007).  Plaintiffs Bolotin and Oerding fail to allege any
28  personal injury caused by the Act.

1  Amendment right to associate with to and vote for presidential candidates (*id.* at 10-14), (3) their

2  political organization plaintiffs' right to associate and to select a presidential candidate (*id.* at 14-

3  15), and (4) the Equal Protection Clause (*id.* at 16-17).[5]

4      Plaintiff Koenig is a California voter who is a registered Republican.  He asserts as bases

5  for his motion that the Act violates (1) the Qualifications Clause (*Koenig* Mem. in Supp. Mot.

6  Preliminary Inj. (*Koenig* Mot.), No. 2:19-cv-01507 ECF No. 11-1, at 8), and (2) his right to vote

7  for the primary candidate of his choice and his right to associate with other members of the

8  Republican Party to select their presidential nominee (*id.* at 14-17).

9      Plaintiff De La Fuente is a voter and a declared candidate for the 2020 presidential

10  nomination of the National Republican Party.  (*De La Fuente* Compl., No. 2:19-cv-01659 ECF

11  No. 1, at ¶ 5.)  He asserts as bases for his motion that the Act violates (1) the Qualifications

12  Clause (*De La Fuente* Mem. in Supp. Mot. for Emergency Preliminary Inj. (*De La Fuente* Mot.),

13  ECF No. 6-1 at 12), (2) 26 U.S.C. § 6103(a), which protects the confidentiality of tax returns (*id.*

14  at 21), and (3) his First Amendment right against compelled speech (*id.* at 23).

15  **ARGUMENT**

16      Plaintiffs' motions should be denied because the plaintiffs are not likely to succeed on the

17  merits of their claims.  A preliminary injunction is "an extraordinary remedy that may only be

18  awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res.*

19  *Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *Am. Beverage Ass'n v. City & Cty. of San Francisco*,

20  916 F.3d 749, 754 (9th Cir. 2019).  It is never awarded "as of right," but in each case, "courts

21  must balance the competing claims of injury and must consider the effect on each party of the

22  granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  "The

23  purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

24  a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)

---

25      [5] The *Melendez* Plaintiffs never served their preliminary injunction on the State

26  Defendants as their preliminary injunction motion was filed before they served the State
Defendants with the Summons and the Complaint, and plaintiffs did not include a copy of the
motion with the documents served.  (*See* Summons Returned Executed, ECF No.

27  26.)  Defendants object to the *Melendez* Motion on that basis.  However, Defendants do address
the arguments made in the *Melendez* Motion in this omnibus opposition in the event the Court

28  considers the motion on the merits.

1    (emphasis added).

2         To prevail on their motions for a preliminary injunction, plaintiffs must establish:  (1) a

3    likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

4    preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is

5    in the public interest.  *Winter*, 555 U.S. at 20.  "Because it is a threshold inquiry, when a plaintiff

6    has failed to show the likelihood of success on the merits, [the Court] need not consider the

7    remaining three *Winter* elements."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

8    I.    **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

9         None of the claims asserted by plaintiffs in their preliminary injunction motions are likely

10   to succeed as a matter of law.  Therefore, a preliminary injunction should not issue.

11        **A.    The Act Does Not Create an Additional Qualification In Violation of the
              Presidential Qualifications Clause.[6]**

12

13        The Act is a type of generally applicable, even-handed ballot-access measure that courts

14   have routinely upheld.  Contrary to plaintiffs' assertions, it does not impose an additional

15   substantive "qualification" that renders a constitutionally significant class of potential candidates

16   ineligible for the Office of the President.  Indeed, the Act's requirements are less stringent than

17   other ballot-access measures upheld by courts against Qualifications Clause challenges, such as

18   those requiring candidates to resign from their jobs in order to run, common disaffiliation and

19   "sore loser" laws that preclude candidates from running for a period of time after an unsuccessful

20   primary bid, and measures requiring candidates to obtain voter signatures or pay fees to appear on

21   the ballot.

22        To determine whether a ballot-access measure is an unconstitutional "qualification,"

23   courts conduct a two-part inquiry: whether the state law "create[s] an absolute bar to candidates

24   who would otherwise qualify under the Qualifications Clause"; and if it does not, whether the

25   state law has the "likely effect of handicapping an otherwise qualified class of candidates."

26        [6] All plaintiffs assert that the Act violates the Presidential Qualifications Clause of the
     United States Constitution.  (*Griffin* Mot. at 3; *Melendez* Mot. at 8; *Koenig* Mot. at 8; *Trump* Mot.

27   at 6; *De La Fuente* Mot. at 12.)

28

                                                    7

1    *Schaefer v. Townsend*, 215 F.3d 1031, 1035 (9th Cir. 2000) (citing *U.S. Term Limits, Inc. v.*

2    *Thornton*, 514 U.S. 779, 828 (1995)).[7]  Under this two-part inquiry, courts have found

3    unconstitutional qualifications for members of Congress in, for example, district residency

4    requirements, loyalty oath requirements, voter registration requirements, and restrictions on those

5    convicted of felonies.  *Id.* (citing *U.S. Term Limits, Inc.*, 514 U.S. at 799; *Schaefer*, 215 F.3d at

6    1039; *Campbell v. Davidson*, 233 F.3d 1229, 1231 (10th Cir. 2000)).  The Act is fundamentally

7    different from the restrictions at issue in any of those cases, and does not violate the Presidential

8    Qualifications Clause.  U.S. Const. art. 2, § 1, cl. 5.

9        First, the Act's financial-disclosure requirement is not an "absolute bar" to presidential

10   candidates who would otherwise meet the terms of the Qualifications Clause.  In this context, an

11   "absolute bar" means a qualification that is "inherent in the candidate."  *Biener v. Calio*, 361 F.3d

12   206, 212 (3d Cir. 2004).  In contrast, where a candidate is *able* to meet the ballot-access

13   requirement, but chooses not to, the candidate is not subject to an "absolute bar."  As the Third

14   Circuit held in upholding a state law requiring candidates to pay a filing fee against a

15   Qualifications Clause challenge, "a candidate financially able to pay a filing fee, but unwilling to

16   do so, is not being subjected to an impermissible wealth requirement."  *Biener*, 361 F.3d at 212;

17   *see also Van Susteren v. Jones*, 331 F.3d 1024, 1027 (9th Cir. 2003) (upholding under the

18   Qualifications Clause state law requiring partisan candidates to be disaffiliated from membership

19   in other political parties for one year before filing for primary ballot access).  Even the Ninth

20   Circuit in *Schaeffer* did not question the district court's finding that the residency requirement at

21   issue there did not erect an "absolute bar" to a candidate's participation, because the candidate

22   could comply by moving to California.  *Schaeffer*, 215 F.3d at 1036.  Similarly here, a

23   candidate's ability to disclose tax returns is not "inherent in the candidate;" therefore, the Act

24   does not pose an "absolute bar" to any candidate's ability to run in the presidential primary.

25        Second, the Act does not have the "likely effect of handicapping an otherwise qualified

26   class of candidates."  *Schaefer*, 215 F.3d at 1035.  In evaluating this inquiry, courts examine

27   _____

28   [7] Although *Schaefer* specifically addressed the Representatives Qualifications Clause, the State Defendants assume that, for purposes of this opposition only, the analysis of that clause in cited cases also applies to the Presidential Qualifications Clause.

1   whether the purported class of candidates is a "class of Constitutional concern," as well as the

2   effect on the handicapped class, taking into account the purpose of the law. *Id.* For example, in

3   *Schaefer*, the Ninth Circuit held that a state law that required candidates for the House of

4   Representatives to reside in the state at the time nomination papers were filed was an

5   impermissible qualification, because the Representative Qualifications Clause requires only that a

6   candidate be a state resident "when elected." *Id.* (citing U.S. Const. art. I, § 2). The court held

7   that nonresident candidates were a class of constitutional concern and that the state's residency

8   requirement was an unconstitutional handicap on their candidacy. *Id.* at 1037. The court found

9   that the Framers had considered and explicitly rejected any requirement of in-state residency

10  before the election, and therefore the challenged residency requirement "imposed the very

11  requirement that the Framers purposefully excluded." *Id.* at 1036-37. The court further held that

12  the requirement significantly hampered nonresident candidates "with homes, families, and jobs in

13  another state," creating a possible deterrent for candidates from running for Congress. *Id.* at

14  1037; *see also Merle v. United States*, 351 F.3d 92, 97 (3d Cir. 2003) (holding that a "'resign to

15  run' law may force the prospective candidate to make a choice between federal employment and

16  running for elective office, but does not constitute an 'additional qualification for the office of the

17  United States Representative.'"); *Cartwright v. Barnes*, 304 F.3d 1138, 1144 (11th Cir. 2002)

18  (holding that law requiring new political party to submit five-percent signature petition to

19  nominate a congressional candidate in the general election is a procedural requirement that does

20  not violate the Qualifications Clause); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th

21  Cir. 1997) (same); *De la Fuente v. Merrill*, 214 F. Supp. 3d 1241 (M.D. Ala. Oct. 7, 2016)

22  (denying preliminary injunction motion because state "sore loser" law barring independent

23  candidate from appearing on the general election ballot if the candidate was a losing candidate in

24  a prior primary election was not based on a "substantive characteristic" and did not violate the

25  Presidential Qualifications Clause).

26          Plaintiffs here have failed to show that candidates who refuse to disclose their tax returns

27  comprise a "class of Constitutional concern." There is no suggestion by plaintiffs and no

28  authority for the proposition that candidates who refuse to disclose their tax returns make up a

9

1    class that the Framers sought to protect.  The Act also does not impose a "handicap" on any class

2    of candidates.  Unlike the state law in *Schaefer,* which required candidates for the House of

3    Representatives to uproot themselves and their families in order to qualify to run, the Act only

4    requires presidential primary candidates to provide the Secretary of State documents that all of

5    them already possess.[8]

6          Plaintiff De La Fuente tries to analogize the Act to loyalty oath requirements.  (*De La*

7    *Fuente* Mot. at 16.)  He reasons that all candidates are free to sign the oath, yet loyalty oaths have

8    been held unconstitutional; therefore, a requirement that candidates release their tax returns must

9    also be unconstitutional.  *Id.*  The critical flaw in De La Fuente's reasoning is that while a loyalty

10   oath may not be an "absolute bar" to candidacy, it would undoubtedly "handicap" a candidate

11   whose political beliefs could not be squared with the oath.  *See Communist Party of Indiana v.*

12   *Whitcomb*, 414 U.S. 441 (1974) (invalidating state law requiring party officers to file oath that the

13   party does not advocate the overthrow of the government by force as a condition of placing

14   candidates on the ballot).  Here, in contrast, the Act's financial disclosure requirement is more

15   akin to the filing fee upheld in *Biener*.  Compliance with the Act would create little or no burden

16   on the candidates.  Indeed, no plaintiff, including President Trump and De La Fuente, has

17   suggested any reason why it might be burdensome for presidential candidates to disclose their tax

18   returns.

19         For these reasons, the Act is a constitutional ballot-access measure, and not an

20   unconstitutional attempt to impose additional qualifications on the Office of the President.

21         **B.     The Act Does Not Exceed California's Authority to Regulate Elections.**

22         The *Trump* Plaintiffs separately argue that the Act "exceeds" California's authority to

23   regulate elections, relying on the same provisions governing the applicable qualifications for a

24   presidential candidate.  (*Trump* Mot. at 8-9.)  This argument is essentially the flip side of

25   plaintiffs' argument under the Qualifications Clause, and therefore fails for the reasons discussed.

26   _____

27         [8] The Act does not apply to any candidate for any year in which the candidate was not
     required to file a tax return.  Cal. Elec. Code § 6883(c).  If a candidate had not yet filed a tax
     return, the Act requires the candidate to submit a copy of the return within five days of filing with
28   the Internal Revenue Service.  *Id.* § 6883(b).

1  The *Trump* Plaintiffs' argument in this respect is based on the misunderstanding that states

2  have "limited authority" to prescribe regulations governing elections.  The Elections Clause

3  imposes on the states the duty "to prescribe the time, place, and manner of electing

4  Representatives and Senators," and "upon Congress it confers the power to alter those regulations

5  or supplant them altogether." *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013);

6  *Rucho v. Common Cause*, __ U.S. __, 139 S. Ct. 2484, 2495 (2019).  The scope of the Elections

7  Clause is broad, and the terms "Times, Places, and Manner" are comprehensive, "embrac[ing]

8  authority to provide a complete code for congressional elections." *Inter Tribal Council of Ariz.,

9  Inc.*, 570 U.S. at 8; *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("To achieve these

10  necessary objectives, States have enacted comprehensive and sometimes complex election

11  codes.").  The authority granted to the states includes the ability "to enact the numerous

12  requirements as to procedure and safeguards which experience shows are necessary in order to

13  enforce the fundamental right involved." *U.S. Term Limits, Inc.*, 514 U.S. at 834 (citation

14  omitted).

15  The *Trump* Plaintiffs concede that states may impose "generally applicable and even-

16  handed" restrictions to protect the election process, but argue that the Act falls outside this scope.

17  (*Trump* Mot. at 8-9.)  Relying on *Anderson*, they contend a state has a less important interest in

18  regulating Presidential elections where the outcome will be largely determined by voters outside

19  the state. (*Id.* at 9.)  That comparison is inapt because *Anderson* addressed a state law that

20  required independent candidates to file paperwork to appear on the presidential *general* election

21  ballot months earlier than partisan candidates.  In contrast, the Act regulates only California's

22  presidential *primary* election, the result of which is determined only by in-state voters.  Thus,

23  *Anderson* is plainly distinguishable. *See Public Integrity Alliance, Inc. v. City of Tucson*, 836

24  F.3d 1019, 1027 (9th Cir. 2016) (en banc) (noting that "primaries serve a different function than

25  general elections" and are a "critical stage . . . as to which the legitimate state interests are not

26  identical with those pertinent to the general election").

27  The *Trump* Plaintiffs also erroneously argue that the Act "does not resemble any of the

28  'procedural' regulations" that have been upheld as valid exercises of state authority to regulate

11

1    elections.  (*Trump* Mot. at 9.)  As established above, however, the Act does not impose an

2    additional qualification or otherwise favor one presidential primary candidate over another—it

3    merely ensures that voters get additional information about the candidates, and leaves it for voters

4    to decide whether and what to do with this information.  And the *Trump* Plaintiffs' attempt to

5    equate the term-limits provision in *Cook v. Gralike*, 531 U.S. 510 (2001), with the Act's

6    requirements falls flat.  (*Trump* Mot. at 10.)  The challenged law in *Cook* was "plainly designed

7    to favor candidates who are willing to support the particular form of a term limits amendment,"

8    requiring members of the state's congressional delegation to promote the amendment and the

9    printing of a statement next to the candidate's name indicating whether he or she "disregarded

10   voters' instructions" or "declined to pledge" support for it.  *Cook*, 531 U.S. at 524.  The Act, by

11   comparison, does not require candidates to express any particular views.

12           As the Supreme Court has pointed out, "[t]here can be no question about the legitimacy of

13   the State's interest in fostering informed and educated expressions of the popular will in a general

14   election."  *Anderson*, 460 U.S. at 796.  The Act here properly fosters the same interest in

15   connection with the presidential primary.

16           **C.    The Act Does Not Violate Plaintiffs' First Amendment Associational,
                     Ballot-Access, or Voting Rights.**

17

18           The Act is a reasonable, nondiscriminatory measure that imposes at most a slight burden on

19   plaintiffs' asserted First Amendment rights of association and ballot access, free speech, and

20   voting rights.  The minimal, if any, burden is outweighed by California's compelling interests.[9]

21   The Act requires candidates to disclose financial information similar to what must already be

22   reported to the Federal Election Commission before the presidential election (as opposed to the

23   primary election) under EIGA; and unlike the financial disclosures under EIGA, candidates do

24           [9] Plaintiff Trump argues that the Act burdens his rights to access the ballot and to
     associate with Republican voters.  (*Trump* Mot. at 11.)  Plaintiffs Koenig, Griffin, and Melendez

25   assert that the Act violates the voters' rights to vote for and associate with the presidential
     candidate of their choice.  (*Koenig* Mot. at 12; *Melendez* Mot. at 11; *Griffin* Mot. at 7.)  Plaintiffs

26   Republican National Committee and California Republican Party argue that the Act violates their
     right to select a presidential nominee.  (*Melendez* Mot. at 14.)  Plaintiff De La Fuente does not

27   raise a First Amendment ballot access or associational claim in his motion, though he raises the
     claim in his complaint.  (*See generally De La Fuente* Mot.)

28

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1   not have to prepare voluminous forms to comply with the Act.[10]  They need only submit tax

2   forms that were already submitted to the federal government.  The Act is also even-handed and

3   politically neutral: it applies to all primary party candidates and is intended to protect the integrity

4   of the election process and California's compelling interests in ensuring that its voters are able to

5   make informed, educated choices in the voting booth.  *See* Cal. Elec. Code § 6881.  Voters do not

6   otherwise have access to information about the financial interests of presidential candidates prior

7   to California's primary election.

8            1.    **The *Burdick* balancing test.**

9       In examining constitutional challenges to specific provisions of a state's election laws, the

10  Supreme Court has developed a flexible balancing standard: a court must weigh "the character

11  and magnitude" of the asserted injury against the "interests put forward by the State as

12  justifications for the burden imposed by its rule," taking into consideration the extent to which the

13  state interests make the burden necessary.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal

14  quotation marks omitted) (citing *Anderson*, 460 U.S. at 789).  This Court has recently reaffirmed

15  the application of the *Burdick* test to challenges to voting regulations.  *Public Integrity Alliance,*

16  *Inc.*, 836 F.3d at 1024-25.

17       "[E]*very* law regulating elections, whether it governs the registration and qualifications of

18  voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—

19  at least to some degree—the individual's right to vote and his right to associate with others for

20  political ends."  *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 (9th Cir. 2015) (emphasis

21  in original) (internal quotation marks omitted).  However, under the *Burdick* standard of review,

22  when a state election law imposes only "'reasonable, non-discriminatory restrictions . . . the

23  State's important regulatory interests are generally sufficient to justify' the restrictions."  *Burdick*,

24  504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).  Accordingly, the Supreme Court has

25  "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling

26  expressive activity at the polls."  *Burdick*, 504 U.S. at 438 (citing *Munro v. Socialist Workers*

27
         [10] The *Trump* Plaintiffs agree that EIGA already "requires presidential candidates to
28  disclose extensive personal financial information."  (*Trump* Compl. at ¶ 4, 2:19-cv-01501, ECF No. 1.)

1  *Party*, 479 U.S. 189, 199 (1986)).  But when the asserted rights are subject to "severe

2  restrictions," the law must be "narrowly drawn to advance a state interest of compelling

3  importance." *Burdick*, 504 U.S. at 434.  The Ninth Circuit has "noted that 'voting regulations are

4  rarely subject to strict scrutiny.'" *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013)

5  (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).

6      A party challenging a state's elections law bears "the initial burden for showing that [the

7  state's] ballot access requirements seriously restricts the availability of political opportunity."

8  *Ariz. Libertarian Party*, 798 F.3d at 731 (citation omitted).

9          2.   **The Act imposes only a slight burden on plaintiffs' asserted rights.**

10      The Act is a reasonable, nondiscriminatory measure that imposes at most a slight burden on

11  plaintiffs' asserted First Amendment rights.  Plaintiffs assert that the Act infringes on candidates'

12  right to access the primary election ballot, political parties' right to nominate their candidates

13  through the primary election, and voters' right to vote for and associate with candidates by voting

14  for them in the primary election.  (*Melendez* Mot. at 10-11, 14; *Griffin* Mot. at 6-8; *Koenig* Mot.

15  at 11-17; *Trump* Mot. at 10-13.)  Regardless of how the asserted rights are characterized,[11] the

16  alleged burden on them is slight because the Act does not exclude any class of candidates from

17  the ballot—*all* candidates are capable of complying with the Act.

18      In examining challenges to ballot-access requirements, courts "focus on the degree to which

19  the challenged restrictions operate as a mechanism to exclude certain classes of candidates from

20  the electoral process." *Clements v. Fashing*, 457 U.S. 957, 964 (1982).  The relevant inquiry is

21  whether the state's ballot-access requirements "seriously restrict the availability of political

22  opportunity." *Ariz. Green Party*, 838 F.3d at 989 (citation omitted); *De La Fuente v. Padilla*, 930

23  F.3d 1101, 1105 (9th Cir. 2019) ("To trigger strict scrutiny . . . [plaintiff] must first show that [the

24  law] 'seriously restrict[s] the availability of political opportunity.'").  Plaintiffs bear the "initial

25  burden" to make that showing. *Ariz. Libertarian Party*, 798 F.3d at 731.  They cannot do so here.

26  _____

27      [11] While described variously as ballot-access rights, associational rights, or voting rights,
   these rights are interrelated, and the *Burdick* balancing test applies the same way in each instance.

28  *Burdick*, 504 U.S. at 438 (citing *Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[T]he rights of
   voters and the rights of candidates do not lend themselves to neat separation.")).

1    The Act does not seriously restrict the "availability of political opportunity" to any class of

2    candidates.  To the contrary, *all* candidates, regardless of their political belief or party affiliation

3    or level of income, are able to disclose their financial interests.  As the Fifth Circuit has held,

4    financial disclosure requirements "do not limit the choices of any particular group of voters."

5    *Plante v. Gonzalez*, 575 F.2d 1119, 1126-27 (5th Cir. 1978) (upholding the constitutionality of

6    Florida's financial disclosure law, which required candidates for constitutional offices to submit

7    the most recent copy of their federal tax return or a sworn statement that identified each separate

8    source and amount of income that exceeded $1,000).  Financial disclosure requirements are

9    unlike loyalty oaths, which deny representation to groups with beliefs that could not be squared

10   with the oath involved, or filing fees, which deny ballot access to poorly financed candidates.  *Id.*

11   at 1126 (citing *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441 (1974), *Lubin v. Panish*,

12   414 U.S. 709 (1974), and *Bullock*, 405 U.S. at 144 (invalidating filing-fee scheme that "falls with

13   unequal weight on voters, as well as candidates, according to their economic status")).  In

14   particular, the Fifth Circuit reasoned that there was no basis to suggest that "those most sensitive

15   to their privacy will be Republicans or Democrats, liberals or conservatives, blacks or whites."

16   *Id.* at 1127.[12]

17        Plaintiffs assert that the Act severely burdens prospective 2020 presidential candidates De

18   La Fuente and President Trump because they will not submit their tax returns to the California

19   Secretary of State, and therefore, will not be placed on California's primary election ballot.

20   However, if these candidates are precluded from appearing on the primary ballot, it would be

21   because of their deliberate refusal to comply with the same financial disclosure requirement that

22   applies to all candidates, not from any burden placed on them by the Act.[13]  For the same reason,

23        [12] The court in *Plante* noted that the Supreme Court had either dismissed an appeal, which
24   is a disposition on the merits, or denied a petition for certiorari in four cases from state supreme
     courts that upheld extensive financial disclosure requirements for candidates, which "caution[ed]"
25   "against finding the [Florida financial disclosure law] unconstitutional."  *Plante*, 575 F.2d at
     1125-26 (citing *Montgomery Co. v. Walsh*, 336 A.2d 97 (Md. 1975), *app. dism'd*, 424 U.S. 901
26   (1976); *Illinois State Employees Ass'n v. Walker*, 315 N.E.2d 9 (Ill. 1974), *cert. denied, sub nom.
     Troopers Lodge No. 41 v. Walker*, 419 U.S. 1058 (1974); *Fritz v. Gorton*, 517 P.2d 911 (Wash.
27   1974), *app. dism'd*, 417 U.S. 902 (1974); *Stein v. Howlett*, 289 N.E.2d 409 (Ill. 1972), *app.
     dism'd*, 412 U.S. 925 (1973)).
         [13] Of course, these candidates would still need to comply with other requirements for
28   placement on the presidential primary election ballot.  *See* Cal. Elec. Code § 6000.1, *et seq.*

1    the other plaintiffs' alleged inability to associate with or vote for these prospective presidential

2    candidates is not caused by the Act, but by those candidates' refusal to comply with the Act.

3    These other plaintiffs' claims are therefore contingent upon the actions of candidates.

4        Furthermore, that two individual candidates might choose not to comply with an even-

5    handed, politically-neutral financial disclosure requirement that *all* candidates are *able* to comply

6    with does not mean that the Act severely burdens their First Amendment rights.  Nor would it

7    make sense to say that voters' rights are severely burdened by a law that the individual candidates

8    easily could, but simply refuse to, comply with.   For example, in *De La Fuente*, the plaintiff

9    challenged California's requirement that independent presidential candidates collect signatures

10   from one percent of the state's registered voters to appear on the general election ballot.  *De La*

11   *Fuente*, 930 F.3d at 1103-04.  The plaintiff argued that the law was a "cost prohibitive" obstacle

12   that severely burdened his right to access the ballot under the First Amendment. *Id.* at 1103-04.

13   The Ninth Circuit disagreed.  The court held that simply because an individual candidate might

14   not be able to fulfill the requirement does not mean that California's overall scheme severely

15   impairs ballot access.  *Id.* at 1105 (citing *Ariz. Libertarian Party v*, 798 F.3d at 730 (9th Cir.

16   2015) ("[Courts] must examine the entire scheme regulating ballot access.")).

17       Similarly, California's election law permits all recognized presidential candidates, as

18   defined in California Elections Code § 6000.1, to be listed on the primary election ballot if they

19   submit the required paperwork, *id.* § 6000.2, and authorize the Secretary of State to release their

20   tax returns, *id.* §§ 6883, 6884.  Simply because two individual candidates choose not to disclose

21   financial information that is readily available to them—as presidential candidates have done

22   routinely for decades—does not mean the law severely burdens their ballot-access rights, or the

23   rights of political parties to associate with them, or the rights of voters to vote for them.

24       The fact that the Act applies even-handedly to all presidential primary candidates further

25   distinguishes this case from others where courts have found the imposition of a severe burden and

26   applied strict scrutiny.  *See De La Fuente*, 930 F.3d at 1106 (citations omitted).  While some

27   plaintiffs characterize the Act as targeting Republican candidates, the Act applies to all

28   candidates, regardless of political belief or affiliation.  Indeed, as some plaintiffs point out, Jerry

16

1    Brown, California's former four-term Democratic governor, did not disclose his tax returns when

2    he ran for president in 1992 (*Melendez* Mot. at 2-3), or when he ran for governor in 2010 and

3    2014.  (*De La Fuente* Mot. at 20).  If the Act had been in effect in those years, he would not have

4    been placed on the primary election ballot, regardless of his party affiliation.  The *Trump*

5    Plaintiffs argue that the Act is not even-handed because it applies only to primary election

6    candidates, whereas independent presidential candidates (who do not run in primary elections)

7    need not disclose their tax returns.  (*Trump* Mot. at 11.)  But the Act focuses only on the primary

8    election and as to that, it is politically neutral and even-handed.  *See also* Section E *infra*

9    (discussing plaintiffs' equal-protection claims).

10        The *Trump* Plaintiffs also suggest in passing that the Act would burden taxpayer privacy.

11    (*Trump* Mot. at 11.)  The Fifth Circuit, however, rejected an argument that financial privacy

12    outweighed the need for Florida's disclosure requirements, holding that "[o]ur society has long

13    regulated people's finances."  *Plante*, 575 F.2d at 1132.  The government commonly directly

14    regulates "the ability of the individual to order his financial affairs."  *Id.* at 1131.  "The indirect

15    effects caused by financial disclosure pale by comparison."  *Id.*  There is no basis for

16    distinguishing *Plante* on this point.  *See also Barry v. City of New York*, 712 F.2d 1554, 1562 (2d

17    Cir. 1983) (holding that the right of privacy does not protect "public employees from the release

18    of financial information that is . . . indicative of a possible conflict of interest," and that "the

19    City's interest in public disclosure outweighs the possible infringement of plaintiffs' privacy

20    interests"); *Duplantier v. United States*, 606 F.2d 654 , 669 (5th Cir. 1979) (holding that EIGA's

21    financial-disclosure requirements for federal judges do not violate their right of privacy); *cf.*

22    *O'Brien v. DiGrazia*, 544 F.2d 543, 545-46 (1st Cir. 1976) ("Privacy in the sense of freedom to

23    withhold personal financial information from the government or the public has received little

24    constitutional protection."), *cert. denied sub nom. O'Brien v. Jordan*, 431 U.S. 914 (1977).

25        Despite plaintiffs' contentions to the contrary, any burden imposed by the Act is minimal.

26    Indeed, compliance with the Act is less burdensome than compliance with EIGA, which, to

27    defendants' knowledge, has never been challenged by any of the plaintiffs in these cases.  The

28    candidates' tax returns are already prepared and can easily be redacted and provided to the

17

California Secretary of State, whereas EIGA requires presidential candidates to prepare an extensive, complex worksheet using information from a number of other sources. *See El-Amin v. State Bd. of Elec.*, 717 F. Supp. 1138, 1141 (E.D. Va. 1989) (holding that the "magnitude" of the alleged burden on associational rights caused by the state's fixed deadline by which candidates must file financial disclosure statements "is small indeed, for candidates can avoid their unofficial fate simply by filing the form sometime during the first six months of election year").

Further, compliance with the Act is not appreciably more burdensome than compliance with EIGA which the *Trump* Plaintiffs describe as requiring "extensive" disclosures. (Trump Mot. at 13; see 5 U.S.C. App. 4 § 101(c)).[14]  President Trump's 2015 and 2016 candidate disclosures "spanned over 90 pages and contained hundreds of lines listing assets and income, bank accounts and investments, financial transactions, liabilities, and the ownership structure of his companies." (*Trump* Mot. at 13.)  And, in certain respects, candidates' financial disclosure obligations under EIGA are more extensive than those under the Act.  For instance, EIGA requires presidential candidates to disclose their interest in property exceeding a fair market value of $1,000, 5 U.S.C. App. 4 § 101(a)(3), and liabilities owed to any creditor exceeding $10,000, *id.* § 101(a)(4).  This information would generally not be disclosed in tax returns.  Yet, no plaintiff suggests that EIGA imposes any burden on their First Amendment rights.  And neither De La Fuente nor President Trump suggests that he would not comply with his disclosure obligations under EIGA.

---

[14] EIGA requires the disclosure of any source, type, and amount or value of income from any source (other than federal employment) and non-investment income over $200; any business assets exceeding $1,000 or income-generating activities over $200; agreement to participating in employee benefit plan, future employment, or severance payments; any source (other than the federal government) that paid more than $5,000 for the candidate's services; each source of earned income for the candidate's spouse over $1,000; each asset related to the candidate's spouses' employment, business activities, or other income-generating activities (other than income from the federal government); any other asset held for investment or income with a value greater than $1,000 or from which more than $2000 in income was received; any purchase, sale, or exchange of real property or securities more than $1,000 by the candidate, or the candidate's spouse or dependent child; liabilities over $10,000 owed by the candidate, or the candidate's spouse or dependent child; and gifts or travel reimbursements over $390 received by the candidate, or the candidate's spouse or dependent child; among other financial information.  *See* 5 USC App. 4 § 102(b).  The candidates may disclose the amount of value of any item in exact dollar amount or in categories of amount range.  *Id.* § 102(b)(2)(B).

Plaintiffs' reliance on *Matsumoto v. Pua*, 775 F.2d 1393 (9th Cir. 1985) is also misplaced. (*Trump* Mot. at 12; *Griffin* Mot. at 7.)  There, the court held that a law that barred recalled officials from running for any city election for two years imposed a severe burden on the rights of recalled officials and their supporters.  *Matsumoto*, 775 F.2d at 1396.  The court reasoned that because city elections were held at four-year intervals, the law, in effect, prevented the recalled council members from running again for five years.  *Id.*  The court further questioned how the law might advance the political process by preventing an official who was recalled because of an unpopular opinion from seeking any elective office for two years.  *Id.*  In sharp contrast to the law challenged in *Matsumoto*, the Act does not directly prohibit any candidate from being placed on the ballot.  To the contrary, all presidential candidates can comply with the Act and, meeting all other requirements, be placed on the primary election ballot.

Finally, *Cook v. Gralike*, 531 U.S. 510 (2001) has no relevance here.  (*Melendez* Mot. at 12.)  In *Cook*, a provision of the Missouri Constitution required that the statement "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" be printed on all primary and general election ballots adjacent to the name of every non-incumbent congressional candidate who refused to take a pledge to support term limits if elected to office.  *Id.* at 515.  The Supreme Court held that the challenged state constitutional provision violated the Elections Clause, because it attempted to "dictate electoral outcomes."  *Id.* at 526.  The Court did not address whether it violated the First Amendment, so the case is inapposite.   It is also clearly distinguishable.  Unlike the requirement at issue in *Cook*, the Act does not "dictate electoral outcomes" in the guise of educating voters; it does not provide any candidate on the primary ballot an unfair advantage or disadvantage.

3.   **The Act furthers the State's compelling interests, which outweigh the slight burden on plaintiffs' asserted rights.**

Any slight burden imposed by the Act on plaintiffs' asserted rights is justified by important—indeed compelling—state interests.  California has a compelling interest in ensuring that its voters have fulsome and accurate information about the financial interests and business dealings of presidential primary candidates so that they may make informed decisions.  Indeed,

19

"[a]n informed public is essential to the nation's success, and a fundamental objective of the First Amendment." *Barry*, 712 F.2d at 1560 (internal citation and quotation omitted).

Financial information about presidential candidates, in particular, is critically important to ensuring an informed electorate. Congress recognized this by requiring presidential candidates to provide extensive financial disclosures under EIGA. 5 U.S.C. app. 4 § 101, *et seq*. Courts have similarly recognized that financial disclosure laws "derive considerable strength from the benefits widely felt to be derived from openness and from an informed public." *Barry*, 712 F.2d at 1560; *see also Plante*, 575 F.2d at 1137 (public disclosure of financial information about candidates "serves one of the most legitimate of state interests"). Indeed, it furthers "[o]ne goal of the First Amendment," which "is to ensure that the individual citizen has available all the information necessary to allow him to properly evaluate speech." *Fed. Election Comm'n v. Furgatch*, 807 F.2d 857, 862 (9th Cir. 1987).

In *Barry*, the Second Circuit upheld a financial disclosure law enacted by New York City that required candidates for City offices to publicly disclose "extensive information about their personal finances," including sources of income (their own and their spouse's), sources of capital gains, sources of gifts or honoraria, indebtedness, and the nature of their investments. 712 F.2d at 1556-1557, 1560. The court held that the disclosure law "plainly furthers a substantial, possibly even a compelling, state interest" in "deter[ring] corruption and conflicts of interest among City officers and employees, and to enhance public confidence in the integrity of its government." *Id*.

Cases in the campaign-finance disclosure context have been particularly clear about the compelling state interest in providing the electorate information about candidates' finances and those of their campaigns. "Providing information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010). "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (*per curiam*), *superseded on other grounds* in *McConnell v. Fed. Elec. Comm'n*, 540 U.S. 93 (2003); *see id.* at 67-68 (holding that government has a substantial interest in requiring

20

1  candidates to disclose the source of campaign contributions to provide the electorate with

2  information about the interests to which a candidate is most likely to be responsive," to "deter

3  actual corruption and avoid the appearance of corruption," and "to detect violations of the

4  contributions limits").  The "vital provision of information [to the electorate] repeatedly has been

5  recognized as a sufficiently important, if not compelling, governmental interest."  *Human Life*,

6  624 F.3d at 1005.

7       The *Trump* Plaintiffs argue the Act is unnecessary to inform California voters about

8  potential conflicts of interests or other improprieties because presidential candidates must provide

9  extensive financial disclosures under EIGA.  (*Trump* Mot. at 13.)  However, this ignores that

10  EIGA does not require disclosure until May 15 of the election year—two months *after*

11  California's primary election, which takes place in March.  5 U.S.C. App. 4 § 101(c).  EIGA,

12  which contains some, but not all, of the information in tax returns, is not substitute for the Act.

13       The *Trump* Plaintiffs further suggest that the Act does not serve California's interests

14  because it applies only to candidates appearing on the primary ballot, and not the general election

15  ballot.  (*Trump* Mot. at 12.)  But the Legislature may effect reform "one step at a time, addressing

16  itself to the phase of the problem which seems most acute to the legislative mind."  *Williamson v.*

17  *Lee Optical of Ok. Inc.*, 348 U.S. 483, 465 (1955).  As the Ninth Circuit recognized in *De La*

18  *Fuente*, the last time an independent presidential candidate appeared on California's general

19  election ballot was 1992 (not including write-in candidates).  930 F.3d at 1105.  Thus, it is

20  overwhelmingly likely that presidential candidates appearing on the general election ballot will

21  have first run in the primary.  Given that reality, it was perfectly reasonable for the Legislature to

22  pass legislation aimed at ensuring that primary voters are adequately informed about the

23  candidates' financial interests and business dealings.  *See also* Section E *infra* (discussing

24  plaintiffs' equal-protection claim).

25       The *Griffin* Plaintiffs' argument citing *Anderson*, 460 U.S. at 794–95, that California has a

26  less important interest in regulating presidential elections than statewide or local elections is also

27  unavailing.  (*Griffin* Mot. at 8.)  *Anderson* addressed an early filing deadline for independent

28  candidates for the *general* election, where, as the Court described, the outcome would be largely

21

1  determined by voters outside the state.  460 U.S. at 795.  In contrast, the Act regulates only

2  California's *primary* election, in which the California's political parties select their preferred

3  presidential candidates.  *See, e.g.*, Cal. Elec. Code §§ 6002 (Democratic Presidential Primary),

4  6470 (Republican Presidential Primary).  The result of the primary election is determined only by

5  in-state voters.  Thus, *Anderson* is plainly distinguishable.  *See Public Integrity Alliance, Inc.*, 836

6  F.3d at 1027 (noting "decades of jurisprudence permitting voting restrictions in primary elections

7  that would be unconstitutional in the general election" because "primaries serve a different

8  function than general elections," and that "legitimate state interests" in primary elections "are not

9  identical to those pertinent to the general election").

10  In sum, because the compelling and weighty state interests served by the Act far outweigh

11  the slight burden on plaintiffs' asserted rights, plaintiffs have no likelihood of success on the

12  merits of their claims.

13  **D.  The Act Does Not Violate Plaintiff De La Fuente's First Amendment Right Against Compelled Speech.**

14

15  The Supreme Court has held that a "compelled speech" violation can occur only if the

16  conduct in question was actually speech—only then may a violation result "from the fact that the

17  complaining speaker's own message was affected by the speech it was forced to accommodate."

18  *Rumsfeld v. Forum for Academic & Institutional Rights (FAIR), Inc.,* 547 U.S. 47, 63-66 (2006).

19  Here, neither a matter of opinion nor a particular viewpoint is at issue, and there is nothing

20  "inherently expressive" in a candidate's compliance or non-compliance with the Act, or in a

21  candidate's tax returns.  *See id.* at 64 (law requiring schools to offer military recruiters the same

22  access to students as nonmilitary recruiters for school to receive federal funding did not affect

23  "inherently expressive" conduct).  The Act requires disclosure only of factually neutral, non-

24  expressive, and presumably truthful information which cannot result in the candidates' "own

25  message [being] affected by the speech [they were] forced to accommodate."  *Id.* at 63.  Indeed,

26  the financial information that must be disclosed under the Act was provided by the candidates

27  *themselves* to the taxing authorities.  Moreover, if the Act compels speech in violation of the First

28

22

1    Amendment, EIGA would pose the same First Amendment problem.  Yet—as with their other

2    claims—no plaintiff in this case has suggested as much; indeed, they argue that EIGA's

3    disclosure requirements are an adequate substitute for the Act.

4         De La Fuente's reliance on *Riley v. National Federation of the Blind of North Carolina,*

5    *Inc.*, 487 U.S. 781 (1988), is unavailing.  (*De La Fuente* Mot. at 24-25.)  In *Riley*, the Supreme

6    Court struck down the North Carolina Charitable Solicitations Act, which set limits on fees

7    collected by professional fundraisers out of charitable contributions, and required fundraisers to

8    affirmatively disclose to potential donors the percentage of fees collected in prior solicitations.

9    487 U.S. at 784–801.  As was well-established in the Court's precedent, charitable solicitations

10   "involve a variety of speech interests . . . that are within the protection of the First Amendment."

11   *Id.* at 788.  Thus, the "regulation of a solicitation 'must be undertaken with due regard for the

12   reality that solicitation is characteristically intertwined with informative and perhaps persuasive

13   speech.'"  *Id.* at 796 (quoting *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620,

14   632 (1980)).  Further, the "predictable result" of the compelled disclosure at issue would be to

15   discourage fundraisers from "engaging in solicitations that result in an unfavorable disclosure."

16   *Id.* at 800.  The Court therefore concluded that the law was subject to "exacting First Amendment

17   scrutiny," and that North Carolina's attempt to prophylactically prevent charities from speaking at

18   all unless they conveyed the state's required message was not "narrowly tailored" to the state's

19   interest in protecting the public.  *Id.* at 798–801.

20        Here, by comparison, California is not requiring candidates to "speak" or communicate

21   any particular message, let alone one that is likely to deter plaintiff De La Fuente or any other

22   presidential candidate from engaging in protected First Amendment activity.  The information

23   that must be disclosed has already been prepared for and disclosed to the taxing authorities and

24   can be easily released to the public; it is purely factual and non-controversial (and presumably

25   truthful); it is not intertwined with other speech; and presidential candidates have been routinely

26   disclosing it for nearly 50 years.  Unlike the North Carolina statute in *Riley*, the Act is narrowly

27   tailored to achieve California's interest in educating voters, and merely codifies a standard

28   already adhered to by most candidates and presidents for many decades.

23

1    This case also bears no resemblance to *West Virginia Board of Education v. Barnette*, 319

2    U.S. 624 (1943) or *Wooley v. Maynard*, 430 U.S. 705 (1977).  (*See De La Fuente* Mot. at 23-24.)

3    In *West Virginia Board of Education*, the Supreme Court held unconstitutional a state law

4    compelling students to salute the flag and recite the Pledge of Allegiance in schools.  319 U.S. at

5    642.  The Court reasoned that "a ceremony so touching matters of opinion and political attitude

6    may [not] be imposed upon the individual by official authority under powers committed to any

7    political organization under our Constitution."  *Id.* at 636.  The Court in *Wooley* struck down a

8    New Hampshire law requiring vehicles to bear license plates with the state motto "Live Free or

9    Die."  *Wooley*, 430 U.S. 705.  The Court reasoned that "a state measure which forces an

10   individual . . . to be an instrument for fostering public adherence to an ideological point of view

11   he finds unacceptable" invades the sphere protected by the First Amendment.  *Id.* at 714–15.

12   Even broadly construed, the holdings of both *Barnette* and *Wooley* are limited to compelled

13   speech that affects the content of the speaker's message by touching on matters of opinion, or

14   compelling the speaker to endorse a particular viewpoint.  The Act does no such thing.  It is

15   neutral, does not force the adoption or articulation of any state-sponsored ideology, and does not

16   affect the content of the purported speaker's message by touching on matters of opinion.

17        In sum, "compelled speech" is not at issue here because the Act does not require

18   disclosure of any matter of opinion or viewpoint, nor does it "regulate conduct that communicates

19   a message or that has an expressive element."  *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d

20   879, 895 (9th Cir. 2018), *cert. denied* 139 S.Ct. 2744 (2019).  De La Fuente's compelled-speech

21   claim has no likelihood of success on the merits.

22        **E.    The Act Does Not Violate the Equal Protection Clause.**

23             1.    **The Act does not unconstitutionally discriminate against partisan
                    candidates in favor of independent candidates.**

24

25        In alleging that the Act violates the Equal Protection Clause, the *Griffin* and *Melendez*

26   Plaintiffs contend the Act unfairly disadvantages political party candidates, who appear on the

27

28

24

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1    primary ballot, in favor of independent candidates, who do not.  (*Melendez* Mot. at 16; *Griffin*

2    Mot. at 11.)  The Ninth Circuit has already rejected the same theory of unconstitutionality.

3         In *Van Susteren v. Jones*, 331 F.3d 1024, the plaintiff challenged California's disaffiliation

4    requirement, which required partisan candidates to have been disaffiliated from membership in

5    other political parties for one year before filing for primary ballot access.  *Id.* at 1025.  The

6    plaintiff asserted that the disaffiliation provision violated the Equal Protection Clause because it

7    treated partisan and independent candidates differently.  *Id.* at 1026.  The Ninth Circuit held that

8    to successfully challenge the requirement on equal-protection grounds, plaintiff "must establish

9    that the two groups, partisan and independent candidates, are similarly situated with respect to the

10   routes they must take to get to the general election ballot."  *Id.* at 1027.  However, "[t]hese two

11   groups are not similarly situated."  *Id.*  "Party candidates must run in a primary election, which is

12   integral to the election process because it serves the important function of winnowing out

13   competing partisan candidates."  *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 735 (1974)).  "By

14   contrast, an independent candidate need not, and indeed may not, participate in a party primary in

15   order to be on the general election ballot."  *Id.* (citation omitted).

16        Here too, contrary to plaintiffs' theory, partisan and independent candidates are not

17   "similarly situated with respect to the routes they must take to get on the general election ballot."

18   The Act only applies to candidates running in the primary, not independent candidates.   This is in

19   keeping with California's important interests in regulating primary elections.  *See Democratic

20   Party of U.S. v. Wis.*, 450 U.S. 107, 126 n.28 (1981) ("Obviously, States have important interests

21   in regulating primary elections, [citation].  A state, for example, 'has an interest, if not a duty, to

22   protect the integrity of its political processes from frivolous or fraudulent candidacies.'"); *Storer*,

23   415 U.S. at 735 ("The direct party primary in California is not merely an exercise or warm-up for

24   the general election but an integral part of the entire election process. . . .  It functions to winnow

25   out and finally reject all but the chosen candidates.").  At the general election stage, where

26   independent and partisan candidates compete, the Act does not impose any requirements on them.

27   Therefore, there is no equal-protection violation.

28

2.      **The Act does not otherwise violate the Equal Protection Clause.**

The *Griffin* Plaintiffs further argue that the Act discriminates against voters who support candidates who will not release their tax returns (and therefore will not appear on the primary ballot).  (*Griffin* Mot. at 11.)  This just repackages their associational rights claim, which, as described above, has no likelihood of success on the merits.  The *Griffin* Plaintiffs do not make separate arguments in support of this equal-protection theory, and the Ninth Circuit has held that where an equal-protection claim is based on an alleged violation of First Amendment rights, as here, "it is unnecessary to conduct a separate equal protection analysis."  *Orin v. Barclay*, 272 F.3d 1207, 1213 n. 3 (9th Cir. 2001)).

**F.      The Act Is Not Preempted by EIGA.**

The *Trump* Plaintiffs' contention that EIGA expressly preempts the Act has no likelihood of success on the merits.  (*Trump* Mot. at 13.)  Unlike bona fide preemption clauses, the provision they cite, 5 U.S.C. App. 4 § 107(b), makes no explicit reference to preemption or state law, and EIGA's statutory history clearly confirms that Congress did not intend to preempt state law.  Further, the *Trump* Plaintiffs cite no cases holding that EIGA preempts state law in this context, and the State Defendants are aware of none.

The key question in analyzing preemption is congressional intent.  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  Moreover, in all preemption cases, "and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied," courts start "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Id*. (internal citation and punctuation omitted).  If the federal statute contains an express preemption clause, federal courts must ascertain the substance and scope of the clause.  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Given the presumption against preemption noted above, "when the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption."  *Id*. at 77 (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

26

EIGA, as noted above, requires the President and presidential candidates, among other federal employees, to file financial disclosure reports.  5 U.S.C. App. 4 § 101(c), (f).  Candidates for nomination or election to the Office of the President must file the required report with the Federal Election Commission by May 15 of the election year.  *Id.* § 103(c).

The *Trump* Plaintiffs point to no statutory language in EIGA constituting an express preemption clause.  (*Trump* Mot. at 13-14.)  Instead, they rely on 5 U.S.C. App. 4 § 107(b), which states that the "provisions of this title requiring the reporting of information shall *supersede any general requirement* under any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest."  (Emphasis added.)  This provision, however, makes no specific reference to preemption or state law.  In some cases, courts have found preemption where federal law expressly "superseded" other requirements, but only where Congress's intent to preempt was unmistakable in light of the surrounding text.  *See*, *e.g. Int'l Franchise Ass'n, Inc. v. City of Seattle*, 97 F. Supp. 2d 1256, 1282 (W.D. Wash. 2015) (finding preemption where "ERISA [Employment Retirement Income Security Act] *preempts and supersedes any and all state laws* that 'relate to' any employee benefit plan") (emphasis added); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 940 (N.D. Cal. 2009) (finding preemption where CAN-SPAM Act "supersedes *any statute, regulation, or rule of a State or political subdivision of a State*") (emphasis added).  Not surprisingly, the *Trump* Plaintiffs point to no case holding that EIGA preempts state law.  *Trump* Mot. at 13-14.

The statutory history of EIGA clearly confirms that the language cited by the *Trump* Plaintiffs is not language of preemption.  When EIGA was enacted in 1978, it provided different disclosure requirements for officers and employees in the three different branches of the federal government in different titles of the act.  Title I applied to legislative personnel, Title II to executive personnel, including presidential candidates, and Title III to judicial personnel.  *See* Ethics in Government Act of 1978, Pub. L. No. 95-521, §§ 101, 201, 301, 92 Stat. 1824 (1978).  Title II, which applied to presidential candidates, contained the same language that the *Trump* Plaintiffs incorrectly claim to be an express preemption clause: "The provisions of this title

27

1    requiring the reporting of information shall supersede any general requirement under any other

2    provision of law or regulation with respect to the reporting of information required for purposes

3    of preventing conflicts of interest or apparent conflicts of interest." *Id.* § 207(c).   In contrast,

4    Title I, which applied to legislative personnel, contained an actual express preemption clause:

5    "The provisions added by *this title*, // [former] 2 USC 708. // and the regulations issued

6    thereunder, shall supersede *and preempt any State or local law* with respect to financial

7    disclosure by reason of candidacy for Federal office or employment by the United States

8    Government." *Id.* § 108 (emphasis added).   However, when Congress amended EIGA in 1989, it

9    adopted the language in former Title II, *not* Title I.   Ethics Reform Act of 1989, Pub. L. No. 101-

10   194, § 107(b), 103 Stat. 1716 (1989).   This history clearly demonstrates that when it amended

11   EIGA, Congress deliberately chose *not* to "supersede and preempt any State or local law."

12          Accordingly, the *Trump* Plaintiffs cannot show a likelihood of success on the merits of

13   their preemption claim under EIGA.

14          **G.     The Act Does Not Violate, and Is Not Preempted by, the Internal Revenue
                     Code.**

15

16          Plaintiff De La Fuente's claim that the Act is preempted by the Internal Revenue Code, 26

17   U.S.C. § 6103, has no likelihood of success.   While characterized as a "preemption" claim, it

18   really seems to be based on a contention that 26 U.S.C. § 6103 does not "authorize" California to

19   pass the Act.   (*De La Fuente* Mot. at 22.)   No such authorization is required under principles of

20   federalism.   In the federal system, the states retain all powers not delegated by the Constitution to

21   the United States or prohibited by the Constitution.   *See, e.g., Murphy v. Nat'l Collegiate Athletic

22   Ass'n*, 138 S. Ct. 1461, 1475–76 (2018); *Printz v. United States*, 521 U.S. 898, 918 (1997).   With

23   respect to tax returns, nothing in the Constitution removes California's authority to require their

24   disclosure as a condition of appearing on the presidential primary ballot.

25          Even viewing it as a preemption claim, it still fails.   26 U.S.C. § 6103 neither expressly

26   nor impliedly preempts the Act.   Like EIGA, 26 U.S.C. § 6103 does not have an express

27   preemption provision.   De La Fuente nonetheless asserts that the Act is preempted because it

28   "conflicts" with 26 U.S.C. § 6103(a).   (*Del La Fuente* Mot. at 22-23.)   It does not.   Conflict

28

1  preemption is a form of implied preemption, which occurs where "there is actual conflict between

2  state and federal law." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040 (9th Cir. 2015).  It arises

3  "when (1) compliance with both federal and state regulations is a physical impossibility, or (2)

4  when state law 'stands as an obstacle to the accomplishment and execution of the full purposes

5  and objectives of Congress." *Id.* (citation and internal punctuation marks omitted).  Neither

6  applies here because 26 U.S.C. § 6103(a) does not preclude the voluntary disclosure of tax

7  documents to third parties or the public by a taxpayer.  Indeed, § 6103(c) expressly provides that

8  the Treasury Secretary may disclose a taxpayer's tax returns with the taxpayer's consent.  For

9  over four decades, presidential candidates have voluntarily disclosed their tax information.  And

10  taxpayers routinely disclose their tax returns for mortgage applications and other purposes.

11      Under the Act, taxpayers who wish to be placed on the California primary election ballot

12  for President must provide consent to having a redacted version of their tax returns disseminated

13  to California voters.  Cal. Elec. Code § 6884(a)(2).  Because consent is provided, there is no

14  conflict with § 6103.

15      That candidates must provide consent to appear on the primary ballot does not change the

16  analysis.  In *Lomont v. Summers*, the plaintiffs brought a preemption challenge to regulations that

17  required applicants to submit certain tax forms to law enforcement officers before manufacturing

18  or transferring specified firearms.  *Lomont v. Summers*, 135 F. Supp. 2d 23, 24 (D.D.C. 2001),

19  *aff'd sub nom. Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002).  The district court considered and

20  rejected the same argument made by Plaintiff *De La Fuente* here, holding there was no conflict

21  with § 6103 because it was the applicants' "choice, and only their choice," that resulted in their

22  tax information being disclosed to law enforcement.  *Id.* at 26; *see United States v. Sheriff, City of

23  N.Y.*, 330 F.2d 100, 101 (2d Cir. 1964) (holding that the disclosure by the taxpayer of his returns

24  to a grand jury is not an unauthorized disclosure under 26 U.S.C. § 6103, "even though it be made

25  by reason of legal compulsion").  Similarly here, it is the presidential candidates' choice, and

26  only their choice, to run in the presidential primary that subjects them to the Act's requirements.

27

28

1

2

**II.    IN THE ABSENCE OF ANY CONSTITUTIONAL VIOLATION, PLAINTIFFS CANNOT SHOW IRREPARABLE HARM.**

3        In the absence of any likely constitutional violation or preemption, plaintiffs cannot show

4   irreparable harm.[15]   And the non-candidate plaintiffs' purported harm is derived from and

5   contingent on the candidates' choices, not from the Act.   They cannot show the Act causes them

6   irreparable harm.

7

8

**III.   PLAINTIFFS CANNOT MEET THEIR BURDEN TO SHOW THAT THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP IN THEIR FAVOR.**

9        In exercising sound discretion, a district court "must balance the competing claims of

10   injury and consider the effect of granting or withholding the requested relief," paying "particular

11   regard for the public consequences in employing the extraordinary remedy of injunction."

12   *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).   "The public interest analysis for

13   the issuance of a preliminary injunction requires [the Court] to consider whether there exists some

14   critical public interest that would be injured by the grant of preliminary relief."   *Indep. Living*

15   *Ctr., So. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated and remanded on*

16   *other grounds,* 132 S. Ct. 1204 (2012).

17        Plaintiffs cannot establish harm sufficient to outweigh the fact that "[a]ny time a State is

18   enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a

19   form of irreparable injury."   *Abbott v. Perez*, 138 S.Ct. 2305, 2324 n.17 (2018) ("the inability to

20   enforce its duly enacted plans clearly inflicts irreparable harm on the State") (citation omitted).

21   An injunction prohibiting the enforcement of the Act would be against the public interest because

22   it would deprive voters of critical information about presidential candidates running in the

23   primary.   As the Legislature found, "California has a strong interest in ensuring that its voters

24   make informed, educated choices in the voting booth."   Cal. Elec. Code § 6881.   A "Presidential

25   candidate's income tax returns provide voters with essential information regarding the candidate's

26   potential conflicts of interest, business dealings, financial status, and charitable donations.   The

27

28
        ――――――――――――――――――
        [15] Additionally, plaintiffs Bolotin and Oerding cannot show irreparable harm because they have no standing to challenge the Act.   *See supra*, n. 4.

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1 information in tax returns therefore helps voters to make a more informed decision." *Id.* The

2 public "can better estimate the risks of any given Presidential candidate engaging in corruption or

3 the appearance of corruption if they have access to candidates' tax returns." For these reasons,

4 the public interest would be harmed if enforcement of the Act is enjoined before the upcoming

5 2020 primary election.

6      Balancing these compelling public interests against plaintiffs De La Fuente and President

7 Trump's claimed harm in not being placed on California's primary election ballot if they choose

8 not to comply with the Act (and the other plaintiffs' alleged harms)—an alleged harm De La

9 Fuente and President Trump could cure by simply complying with the Act—the equities clearly

10 favor of the State Defendants.

11 **CONCLUSION**

12      For the reasons provided above, plaintiffs' motions for preliminary injunction in each of

13 the five related cases should be denied.

14

15   Dated:  September 5, 2019                  Respectfully submitted,

16                                                 XAVIER BECERRA
          Attorney General of California

17           PAUL STEIN
          Supervising Deputy Attorney General

18           */ s / Peter H. Chang*

19           PETER H. CHANG
          Deputy Attorney General
          *Attorneys for State Defendants*

20 SA20191026562

21

22

23

24

25

26

27

28

31